No. 2835

Second Circuit

---

KOLB & WIFE v. KINMAN, ET AL.

---

(December 11, 1926. Opinion and Decree.)
(January 28, 1927. Rehearing Refused.)

---

(*Syllabus by the Court*)

1. Louisiana Digest—Damages—Par. 84.
In a suit for damages the burden is on plaintiff to make out his case by competent evidence.
    Jacob vs. Illinois Cent. **R. R. Co.,** 133 La. 735, 63 South. 306.

Appeal from the Third Judicial District Court of Louisiana, Parish of Jackson. Hon. S. D. Pearce, Judge.

Action by James A. Kolb and wife against J. R. Kinman, et al.

There was judgment for defendant and plaintiffs appealed.

Judgment affirmed.

Dhu Thompson, of Ruston, attorney for plaintiffs, appellants.

T. E. Price, of Ruston, attorney for defendants, appellees.

### STATEMENT OF THE CASE

REYNOLDS, J.  In this case the plaintiffs, James A. Kolb and wife, Mrs. Lillie M. Kolb, sue to recover $15,200.00 for the death of their son, Melvin J. Kolb.

They allege that their son's death resulted from a bruise or hurt on his right hip and groin; that the ligaments in his right groin and hip joint were torn loose and apart by the sons of the defendants while they were at play on the school ground at Ansley in Jackson Parish, Louisiana.

Defendants denied that their sons inflicted any injury on plaintiffs' son and denied that he died from any injury inflicted on him by their sons and alleged that plaintiffs' son died from natural causes. They further alleged that if their sons inflicted any injury on plaintiffs' son and that he died from such injuries, that such injuries were inflicted without malice and in the course of games in which plaintiffs' son and defendants' sons were engaged and that plaintiffs are not liable therefor.

On these issues the case was tried and there was judgment in favor of defendants and plaintiffs have appealed.

### OPINION

Of the several defenses set up by defendants we have only found it necessary to consider one as that completely disposes of the case, and this question is whether or not plaintiffs have established their contention that their son died as the result of injuries inflicted on him by defendants' sons.

The testimony relied on by plaintiffs to prove their contention is that of their family physician, Doctor J. J. Bennett, who testified, pages 49, 50, 51, 52, 53, 54, 55:

"Q. From the history of the case and your examination and the complaint of the patient, would you say that the injury in the right hip was the moving cause of the boy's death?

"A.  I do.

\*  \*  \*  \*

"Q.  Doctor, you say you saw no extra-ordinary indications of any injury in or around the right hip?

"A.  There was no abrasion or bruises; just a general swelling of the entire right hip.

\*  \*  \*  \*

"Q.  Do you remember saying that, in your opinion, he was suffering from inflammatory rheumatism?

"A.  I do.

"Q.  In other words, you thought, at that time, that that was his trouble, Doctor?

"A.  I did, yes, sir.

"Q.  So, what did you diagnose the case as; what did the boy die of, in your opinion?

"A.  Died of a general septic infection, commonply spoken of as blood poison.

"Q.  Did you call that meningitis?

"A.  He had a meningitis before he died. secondary to his general infection.

"Q.  Well, then, what do you say he died with, in your opinion, or from what was the cause of the death?

"A.  I think general infection; blood poison.

"Q.  Well, then, do you say now that you think that was the cause of the death and not the spinal meningitis?

"A.  The meningitis was more or less a terminal factor in the disease; it was

the most marked disturbance at the time of his death.

"Q. At that time, did you give out the statement or say that he died with meningitis, or was that you opinion at that time, and is it your opinion now?

"A. Meningitis, secondary of this general infection, yes.

"Q. In order to receive septic blood poison, could he have received that without the skin being broken or from an injury where the skin was not broken and not received any exposure?

"A. You have to have an abrasion somewhere.

"Q. To die with the disease you say this boy died of?

"A. Yes, sir.

"Q. Now, after examining this boy, did you find any skin abrasions on him?

"A. Nothing more than this little sore on his left leg?

"Q. Now from this swollen condition alone, and standing by itself, without the septic poison, could you say what would have been the result; would that necessarily have caused death, in other words, Doctor?

"A. Without the infection, no.

"Q. And, in order to receive the infection, he must necessarily have had to have a skin abrasion?

"A. An abrasion, yes.

"Q. And you did not find an abrasion on this boy?

"A. Nothing, except this open sore on his left leg.

"Q. Then, Doctor, what are the several causes you find that will produce the disease that you speak of?

"A. An entrance into your blood stream of some bacteria germ.

"Q. How does that enter the body?

"A. Through an abrasion into the blood stream.

*   *   *   *

"Q. In your testimony then, Doctor, the only source of this septic poison would have been in this instance from the old sore, through the old sore; that is your testimony?

"A. That is the most probable source of infection; there could have been others.

"Q. Name the others.

"A. From an abscessed tooth; discharging ears; tonsilitis; probably proslititis; any place where the pus would likely form.

"Q. Your testimony is that the bruise or pain, standing alone, by itself, would not have created or brought about the death of the boy?

"A. Yes.

*   *   *   *

"Q. You are not sure whether this boy died of spinal meningitis or this infection?

"A. The two combined, yes. The meningitis was secondary.

"Q. As a matter of fact, Doctor, you gave in the cause of his death as meningitis, did you not?

"A. Possibly; I believe I did.

"Q. That is true?

'A. Yes, I did, in filling out the death certificate for the Board of Health.

*   *   *   *

"Q. And he could have died of meningitis from a germ that he contracted simultaneously with quitting school, and died from that disease, whether he had had the tussle with the boys or not?

"A. Yes.

*   *   *   *

"Q. And, therefore, you cannot say positively that the tussle with the boys brought into activity the germ or meningitis infection or not, can you?

"A. No, I could not say.

*   *   *   *

"Q. My question is, is it possible to say positively what brought it into activity?

"A. No.

*   *   *   *

"Q. From the examination that you made and were able to make, without more modern equipment, would it be possible to determine the origin of this germ?

"A. You mean the germ that killed this boy?

"Q. Yes?

"A. No.

*   *   *   *

"Q. As a matter of fact, from the time the symptoms develop, a party may die within a period of four hours to within thirty days time, might he not?

"A. Yes.

*   *   *   *

"Q. I want to know whether it is possible, to a degree of certainty, to say what caused the meningitis infection in this case?

"A. No.

*   *   *   *

"Q. Would you say that he died with traumatic meningitis or septic meningitis?
"A. Septic meningitis."

If this fair and unbiased testimony of Doctor Bennett stood alone we would be justified in holding that the tussle between plaintiffs' son and defendants' sons complained of by plaintiffs in no way contributed to cause plaintiffs' son's death. But it does not stand alone.

Doctor S. L. White testified, pages 62, 71, 72:

"Q. Take his testimony in the manner in which he says the boy died from septic meningitis, is it possible in such cases, Doctor, to trace positively the origin or cause of the disease in that case, in your opinion, where he had no access to a laboratory and other instruments to make an accurate test?
"A. It is not.

*  *  *  *

"Q. Even though he received an injury such as he did there is no way to tell whether that injury was the exciting cause or not?
"A. No.

*  *  *  *

"Q. And you say that this injury could not have been the exciting cause of the meningitis germ without there was a breaking of the skin?
"A. No, certainly not."

Doctor Rutledge testified, page 80:
"Q. Do you know what he died with?
"A. He had a general septic condition.
"Q. You don't know what caused that?
"A. I could not say what; no, sir.
"Q. Have you an opinion?
"A. I think that it was due to infection, probably from the sore; that was my opinion, and that is what I told Doctor Bennett when I was called in consultation.
"Q. You don't think that the injury, an injury that would cause the swelling of the hip, and cause the swelling that this young man complained of, would be such as to cause death?
"A. I could not see it that way.
"Q. You don't think it was?

"A. The only thing that I could see was the septic condition; we don't know the exciting cause."

Doctor W. S. Harrel testified, page 146:
"Q. In your opinion, what did this boy die with, Doctor?
"A. I think the boy died with septicemia, and that that was what he was suffering with when I saw him.
"Q. In your examination, and from the history of the case, do you think it was possible to determine the exact cause of the death of this boy, under the examination that you were able to make there, not having the laboratory equipment or other scientific means?
"A. It didn't look possible to me; I was unable to determine.
"Q. Then, as a matter of fact, as I understand from your testimony and from your examination and from the history of the case, the death would be what you term problematical or guesswork, indefinite; in other words, in your opinion, could there be any definite cause of the death, that is practically the same question I asked you a while ago?
"A. Not as I see it."

W. J. Austin testified, pages 82, 83, 84, that at the time of the alleged injury to plaintiffs' son by defendants' sons he was a teacher in the Ansley school and:

"Q. Now, in the class just before the noon recess, was Melvin in your class at that time?
"A. He was.
"Q. On the last day he was at school?
"A. Yes, sir.
"Q. Did you have any occasion to notice Melvin with reference to his condition at that time?
"A. I did.

*  *  *  *

"Q. What can you say with reference to his looks on that occasion, when he reported to recite his lesson on December 1st, just before the noon hour?
"A. The boy did not recite that day in my class.
"Q. Due to what fact, if you know?
"A. Simply because the boy said he didn't feel like it.
"Q. From the looks of the boy, would you say whether it indicated that he was or was not feeling bad, as compared with

his looks on other days and during other lessons?

"A. Compared to his looks on that day, according to my opinion, he was not feeling well; he told me that he was not feeling well, and I told him that he need not recite; I don't expect any student of mine to recite when he is not feeling well; and the only thing that I have to go by is to take the word of the student and his looks."

This evidence convinces us that it could not certainly be said what caused the death of plaintiffs' son, and that septic meningitis cannot be contracted from a bruise or wound unaccompanied by an abrasion of the skin; it is perfectly clear that there was no abrasion of the skin of plaintiffs' son. The testimony of Mr. Austin shows that the plaintiffs' son, Melvin J. Kolb, was not feeling well just before the noon recess during which it is alleged he was injured in a tussle with defendants' sons and that the injuries caused his death.

The burden is on plaintiff in a damage suit to establish his contention by a fair preponderance of the evidence. The plaintiffs in this case have failed to do this.

Plaintiffs' counsel cite Reth vs. Russell, 141 La. 586, 75 South. 418, in suport of the contention that if the injury sustained by plaintiffs' son lessened the resisting force of his body and thereby rendered him more susceptible to contracting disease, plaintiffs would be entitled to recover. This authority has no application, in our opinion, to the facts of this case, for the reason that that case arose under the Workmen's Compensation Act. But even if that case were applicable to this, still plaintiffs would not be entitled to recover since there is no evidence in the record that in our opinion in any way shows that the injury alleged to have been received by plaintiffs' son contributed directly or indirectly to cause Melvin J. Kolb's death.

Our learned brother of the District Court rendered judgment rejecting plaintiffs' demand. After carefully reading the evidence and the briefs of counsel and the opinion of the trial judge, we are convinced that the judgment appealed from is correct.

It is therefore ordered, adjudged and decreed that the judgment of the lower court be affirmed.